# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| OTAY MESA PROPERTY, L.P., *et al.*, ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| v. ) | No. 13-cv-0240 (KBJ) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| THE INTERIOR, *et al.*, ) | |
| ) | |
| DEFENDANTS. ) | |

## MEMORANDUM OPINION

Plaintiffs Otay Mesa Property, L.P., Rancho Vista Del Mar, and Otay International, LLC (collectively "Otay Mesa" or "Plaintiffs") own land in San Diego County, California, that the U.S. Fish and Wildlife Service ("the FWS") has designated as a "critical habit" for the endangered Riverside fairy shrimp under the Endangered Species Act ("the ESA"), 16 U.S.C §§ 1531–1544. Otay Mesa has filed the instant action against the FWS and its acting Director, the U.S. Department of the Interior ("Interior"), and two high-ranking Interior officers in their official capacities (collectively, "Defendants") to challenge the propriety of the FWS's critical habitat designation under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[1] This Court has already issued one memorandum opinion in this matter, *see Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35 (D.D.C. 2015), wherein all disputed issues between Otay Mesa and FWS concerning the critical habitat designation

---

[1] The FWS is an agency with the Interior Department. (Compl. ECF No. 1, ¶ 5.) Along with the FWS and Interior, Otay Mesa has sued Interior Secretary Ryan Zinke and the current Assistant Secretary of the Interior for Fish, Wildlife, and Parks. (*Id.*)

for the endangered Riverside fairy shrimp were resolved save one: namely, whether it was proper for the FWS to assign a 'critical habitat' designation to 56 acres of Otay Mesa's property that is immediately adjacent to the stock pond that contains the shrimp solely on the basis of the agency's finding that the types of geological features that are generally necessary to support the shrimp species exist on those acres. The FWS had concluded that the 56 acres constituted either "occupied" critical habitat under the first prong of section 1532(5)(A) of Title 16 of the United States Code, or, alternatively, "unoccupied" critical habitat essential for the conservation of the species under the second prong of that same provision, but the agency had not conducted any hydrological studies or other surveys to determine the extent to which the 56 acres of land actually supported the ecological system that is necessary for the shrimp's survival. As explained below, the question of whether or not the FWS employed an appropriate methodology to reach the critical habitat determination at issue in this case depends upon the meaning of the term "occupied" as it appears in the ESA, and also turns on the distinction that that statute makes between the standards for designating occupied and unoccupied critical habitats.

Before this Court at present are the parties' renewed cross-motions for summary judgment and the supplemental briefs that they have filed regarding these key legal issues. Otay Mesa maintains that it is entitled to judgment as a matter of law, because the FWS improperly designated the 56 acres of land as "occupied" habitat even though the shrimp live only in the one-acre stock pond and not on the land. (*See* Pls.' 2d

Suppl. Br., ECF No. 42, at 8–9.)[2]  Otay Mesa further contends that the FWS's occupied

critical habitat designation is improper under the ESA because there is no record

evidence demonstrating that all 56 acres of adjacent land must be preserved in order to

supply water to the one-acre stock pond where the shrimp live, and that the FWS

improperly designated the 56 acres as "unoccupied" critical habitat in the alternative

because it failed to apply the statutory standard for unoccupied critical habitat

designations.  (*See id.* at 11–13; Pls.' Resp. to Defs.' Suppl. Br. & Pls.' Renewed Mot.

for Summ. J., ECF No. 36, at 3–4.)  Defendants respond that the Court should order

summary judgment in their favor, because the FWS reasonably determined that the

stock pond and all 56 adjacent acres satisfy the ESA's definition of occupied critical

habitat on the basis of the best available scientific data (Defs.' 2d Suppl. Br., ECF No.

41, at 7–12, 16–22), and the FWS applied the correct legal standards when alternatively

designating this area as unoccupied critical habitat under the ESA (*id.* at 12–16).

For the reasons explained fully below, this Court finds that the law and record

evidence do not support the FWS's "occupied" or "unoccupied" critical habitat

designations, and thus the critical habitat determination that Otay Mesa challenges here

must be set aside as arbitrary and capricious and contrary to law in violation of the

APA.  To be specific, the manner in which the FWS determined the scope of the area

that the Riverside fairy shrimp occupies is inconsistent with the ESA's prescriptions for

making that determination, and when the agency determined the area of unoccupied

critical habitat, it failed to employ the statutory standard that is applicable to

---

[2] Page numbers herein refer to those that the Court's electronic case filing system automatically
assigns.

unoccupied critical habitat designations.  Consequently, Otay Mesa's renewed motion for summary judgment must be **GRANTED**, Defendants' motion for summary judgment must be **DENIED**, and the designation of Otay Mesa's property as critical habitat must be **VACATED**.  A separate Order that remands this matter to the agency for further proceedings will follow.

## I.     BACKGROUND

### A.     Prior Proceedings

The procedural history of this dispute is described in detail in the opinion that the Court previously issued in this case, *see Otay Mesa Prop.*, 144 F. Supp. 3d 35; therefore, only a brief recounting of certain relevant background details is necessary here.  The long and short of it is that Riverside fairy shrimp are "small freshwater crustacean[s]" that "rely upon 'vernal pool' hydrology" to grow and reproduce, *id.* at 44, and since 2001, the FWS has been engaged in rule-making aimed at designating the critical habitat for this endangered species pursuant to the prescriptions of the ESA, *see id.* at 47.[3]  Two prior rules that the FWS promulgated with respect to these shrimp—one in 2001 and one in 2005—were each challenged in federal court, which resulted in settlement agreements and the subsequent promulgation of revised rules.  *Id.*  At issue in this case is the most recent critical habitat designation for this species, which the FWS promulgated by a third rule-making process that took place in 2012 ("2012 Rule"), following the settlement of litigation arising from the 2005 rule.

---

[3]  Vernal pools are "pools that fill with water during fall and winter rains and evaporate in the spring." *Otay Mesa Prop.*, 144 F. Supp. 3d at 44.

Plaintiffs are businesses that own the land in San Diego County, California, including property on which is located a one-acre vernal pool that was formerly a cattle stock pond and is now home to endangered Riverside fairy shrimp. Based upon environmental surveys that showed that the filled stock pond contained adult Riverside fairy shrimp during the wet season and the dried-out bed of that stock pond had Riverside fairy shrimp cysts in it during the dry season, the FWS determined that this endangered species "occupied" the one-acre stock pond at the time the species was listed in 1993—a finding that this Court has already upheld. *Id.* at 59. In the 2012 Rule, the FWS proceeded to designate as "occupied" critical habitat for the Riverside fairy shrimp not only the stock pond itself, but also approximately 56 acres of surrounding land (which is referred to throughout this Opinion as "Subunit 5c" or "the Property"), and alternatively, the FWS labelled those same areas as "unoccupied" critical habit, for the purpose of the ESA. *Id.* at 52–53.[4] Otay Mesa has plans to build a recycling center and landfill on the Property, and in the instant context, it represents that the FWS's critical habitat designation "may make the completion of this project infeasible." (Pls.' Mem. in Supp. of Summ. J., ECF No. 9-1, at 34.) Consequently, Otay Mesa has filed a complaint that contends that the FWS's designation of the one-acre vernal pool and the surrounding 56 acres of land as protected critical habitat under the ESA was an arbitrary and capricious determination, and was also contrary to law, in violation of the APA. *See Otay Mesa Prop.*, 144 F. Supp. 3d at 39.

---

[4] There is no dispute that the only location on the Property where shrimp are actually located is the one-acre pool.

On September 30, 2015, this Court denied without prejudice the parties' initial cross-motions for summary judgment. *Id.* In so ruling, the Court found that Otay Mesa had standing to bring its lawsuit, and that the FWS did not act arbitrarily or capriciously with respect to either the economic analysis underlying the critical habitat designation or its decision not to conduct an analysis of the challenged critical habitat designation under the National Environmental Policy Act, 42 U.S.C §§ 4321–4370. *See id.* at 39. This Court further found that it had insufficient information to resolve the parties' dispute about the rationality of the scope of the FWS's critical habitat designation, because the Court could not "determine on the record before it whether the FWS has acted arbitrarily in concluding that 56 acres of land surrounding the one-acre pond is, in fact, watershed" for the pond. *Id.*; *see also id.* at 39–40 (explaining that "the portion of the administrative record that was submitted to the Court does not explain *how* the FWS determined that all of the geographic area that it designated as critical habitat qualifies as such" (emphasis added)). Consequently, the Court ordered the parties to file supplemental briefs that addressed the factual underpinnings for the FWS's designation of 56 acres of land as watershed for the one-acre pond, along with any additional supporting documents from the Administrative Record. (*See* Suppl. Br. Order, ECF No. 31, at 1–2.)

### B. Current Proceedings

Defendants and Otay Mesa filed the requested supplemental briefs and renewed their cross-motions for summary judgment. (*See* Defs.' Suppl. Br., ECF No. 33; Pls.' Resp. to Defs.' Suppl. Br. & Pls.' Renewed Mot. for Summ. J., ECF No. 37.) The Court heard oral argument on the parties' renewed motions (Min. Entry of Mar. 15, 2017), and

during the hearing, Defendants' counsel explained that the FWS's methodology for determining the scope of the watershed—and thus the area that the FWS had deemed "occupied" or, alternatively, "unoccupied" critical habitat for the Riverside fairy shrimp—consisted of mapping the geographic location of the "primary constituent elements" ("PCEs") that the FWS had identified for the endangered species at issue (which, as noted, is itself located solely in the one-acre stock pond), and then drawing the boundary of the critical habitat around those areas abutting the stock pond where all three PCEs exist, without additional analysis.  (*See* Mot. Hr'g Tr., 47:4–48:24, Mar. 15, 2017.)[5]

As a result, it became apparent that the parties' dispute about whether the FWS's designation of the 56 adjacent acres as critical habitat violates the APA is, at bottom, a disagreement over whether the FWS's method of defining the scope of the territory that is "occupied" by the endangered species at issue is consistent with the ESA, which in turn implicates the issue of whether the area around the stock pond qualifies as "occupied" critical habitat under the statute—an issue that this Court did not reach in the context of its earlier summary judgment ruling.  *See Otay Mesa Prop.*, 144 F. Supp. 3d at 59–61 (explaining that "the FWS [had] decided that the Riverside Fairy shrimp 'occupied' the stock pond and [also] the watershed area surrounding the stock pond at

---

[5] It is undisputed that the PCEs for the Riverside Fairy shrimp are:

> [F]irst, a vernal pool wetland, with pools that have suitable chemistry, that are filled 2 to 8 months during the winter and spring (though not necessarily every year), and that dry out in late spring or summer; second, adjacent areas that function as the local watershed, which may range in size from a few acres to more than 100 acres and which facilitate the filling of the pools in the winter and spring; and third, underlying soils that have an impermeable layer such that the pool can fill during the winter and spring months.

*Otay Mesa Prop.*, 144 F. Supp. 3d at 48 (citations omitted).

the time of listing," and had determined, in the alternative, that "Subunit 5c qualified as 'unoccupied' critical habit[,]" but finding that, regardless, the agency had the statutory authority to make that determination). In other words, the Court discovered that, far from being immaterial, the question of whether the geographic area surrounding the stock pond constitutes "occupied" or "unoccupied" terrain under the ESA was crucial to resolving the merits of Otay Mesa's remaining APA claim. As a result, the Court ordered the parties to file a second round of supplemental briefs, this time addressing (1) whether the "occupied" or "unoccupied" prong of the statutory critical habitat definition applies to the habitat at issue here; (2) whether the ESA authorizes the FWS to delineate the protected critical habitat under either prong by merely mapping the identified PCEs in the general area; and (3) whether this Court should give any weight to the Ninth Circuit's decision in a case that agency counsel raised and relied upon during the hearing—*Alaska Oil and Gas Association v. Jewell*, 815 F.3d 544 (9th Cir. 2016)—which held that the FWS could designate an area that contains the PCEs for a species as critical habitat without establishing that the species currently uses that area, *see id.* at 555–56. (*See* 2nd Order for Suppl. Briefing, ECF No. 38.)

The parties filed their second supplemental briefs on May 10, 2017, and May 31, 2017, respectively, and responses followed. (*See* Defs.' 2d Suppl. Br., ECF No. 41; Pls.' 2d Suppl. Br., ECF No. 42; Defs.' Resp. to Pls.' 2d Suppl. Br., ECF No. 43; Pls.' Resp. to Defs.' 2d Suppl. Br., ECF No. 44.) In its brief, Otay Mesa insists that the "occupied" prong of the critical habitat provision is inapposite because the shrimp are indisputably only present in the pond and not anywhere else on the 56 surrounding acres. (*See* Pls.' 2d Suppl. Br. at 8.) Otay Mesa argues further that the FWS erred in

delineating all 56 acres as "unoccupied" critical habitat because the presence of PCEs, standing alone, is insufficient to support an unoccupied critical habitat designation (*id.* at 8–17); instead, according to Otay Mesa, the unoccupied critical habitat standards required the FWS to "determine how much, if any, of the 56 acres was necessary to water the stock pond[,]" and to make a specific finding that "this area was essential to the conservation of the species[,]" given "that existing occupied habitat was inadequate" (*id.* at 14). Otay Mesa also maintains that this Court should not afford any weight to the Ninth Circuit's decision in *Alaska Oil*, because that case dealt with the designation of occupied critical habitat *for a species that was highly mobile*, while this case concerns unoccupied critical habitat for an essentially *immobile* species. (*Id.* at 17.)

For their part, Defendants insist that the FWS "relied primarily" on the occupied prong of the ESA's critical habitat definition, and that the prescriptions of that provision apply to the instant circumstances. (Defs.' 2d Suppl. Br. at 7.) In Defendants' view, the Riverside fairy shrimp species "occupies" the stock pond and also all of the surrounding acres (despite the actual confinement of the animals themselves to the pond) within the plain meaning of the statute, and furthermore *Alaska Oil* teaches that it is permissible for the FWS to rely solely on the presence of the PCEs on the acres surrounding the pond, without studying runoff or conducting any other kind of hydrologic analysis, in order to delineate "the specific areas within the geographical area occupied by the species[,]" 16 U.S.C. § 1532(5)(A)(i). (*See* Defs.' 2d Suppl. Br. at 7–20.) Defendants further argue that the FWS properly designated the stock pond and the 56 surrounding acres as unoccupied critical habitat in the

alternative, *see* 16 U.S.C. § 1532(5)(A)(ii) (authorizing designation of areas "outside

the geographical area occupied by the species" if the Secretary determines such areas

"are essential for the conservation of the species"), because the general loss of vernal

pool habitat in this area of San Diego County necessitates the preservation of this

known vernal pool, and because the Riverside fairy shrimp in this particular pool have

unique genetics.  (*See* Defs.' 2d Suppl. Br. at 11–16.)  Defendants also maintain that,

since no hydrologic studies were readily available at the time of the designation and the

ESA only requires that the agency rely on the best available data, the FWS did not need

to conduct any hydrologic analysis to support this unoccupied critical habitat

designation.  (*See id.* at 16–19.)

With the two rounds of supplemental briefing complete, the parties' renewed

motions for summary judgment are now ripe for this Court's consideration.

## II.     LEGAL STANDARDS

### A.     Summary Judgment in APA Cases

Summary judgment is the appropriate means for determining, as a matter of law,

if "agency action is supported by the administrative record and is otherwise consistent

with the APA standard of review."  *Hill Dermaceuticals, Inc. v. FDA*, No. 11-1950,

2012 WL 5914516, at *7 (D.D.C. May 18, 2012) (citing *Richard v. INS*, 554 F.2d 1173,

1177 & n.28 (D.C. Cir. 1977)).  While the ordinary summary judgment standard is laid

out in Federal Rule of Civil Procedure 56, "it is well established that, in cases involving

review of a final agency action[,] . . . the standard set forth in [Rule 56] does not apply

because of the limited role of [the] court in reviewing the administrative record."

*Otsuka Pharm. Co., Ltd. v. Burwell*, 302 F. Supp. 3d 375, 389 (D.D.C. 2016), *aff'd sub*

*nom. Otsuka Pharm. Co. v. Price*, 869 F.3d 987 (D.C. Cir. 2017) (alterations in original) (internal quotation marks and citation omitted).  In this context, the function of the agency is "to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  In other words, "the district judge sits as an appellate tribunal[,]" *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and "[t]he entire case on review is a question of law, and only a question of law[,]" *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see also Cognitive Prof'l Servs. Inc. v. U.S. Small Bus. Admin.*, 254 F. Supp. 3d 22, 32 (D.D.C. 2017) (making clear that the core legal question is "whether the agency acted arbitrarily or capriciously, or in violation of another [APA] standard") (alteration in original) (internal quotation marks and citation omitted)).

Notably, "[w]hile the court's review [on summary judgment] must be 'searching and careful, the ultimate standard of review is a narrow one' and the court 'is not empowered to substitute its judgment for that of the agency.'"  *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 21 (D.D.C. 2010) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).  Moreover, in cases involving complex scientific determinations and technical expertise, the Supreme Court has directed that the district court "generally be at its most deferential." *Baltimore Gas & Electric Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983);

*see also Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (noting that where a determination "requires a high level of technical expertise, [a court] must defer to the informed discretion of the responsible federal agencies" (internal quotation marks and citation omitted)). However, "[t]his deferential standard cannot permit courts [] merely to rubber stamp agency actions, nor be used to shield the agency's decision from undergoing a thorough, probing, in-depth review." *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 186 (D.D.C. 2014) (internal quotation marks and citation omitted); *see also Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 916 (D.C. Cir. 2011) ("Substantial evidence is a deferential standard. But deference is not abdication."); *Huff v. Vilsak*, 195 F. Supp. 3d 343, 352 (D.D.C. 2016) (noting that, even under the deferential standard of review, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking, which means the court *must* ensure that the decision was based on a consideration of the relevant factors and determine whether there has been a clear error of judgment" (internal quotation marks, brackets, and citation omitted)).

### B.    The *Chevron* Framework

When assessing the FWS's interpretation of the Endangered Species Act—a statute that that agency administers—this Court is required to apply the familiar two-step framework laid out in *Chevron, USA., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C .Cir. 2012). Step One directs that, if "Congress has directly spoken to the precise question at issue," the Court must give effect to that "unambiguously expressed intent[.]" *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 414 F.3d 50, 57 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *Chevron*, 467

U.S. at 842–43).  In conducting the requisite analysis, the pertinent question is not

whether the statutory terms at issue are "'in some abstract sense, ambiguous, but rather

whether, read in context and using the traditional tools of statutory construction,' the

terms unambiguously mean what the party claiming victory at Step One says they

mean."  *Otsuka*, 302 F. Supp. 3d at 389 (quoting *Cal. Indep. Sys. Operator Corp. v.*

*FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004)); *see also Sierra Club v. EPA*, 551 F.3d

1019, 1027 (D.C. Cir. 2008) (explaining that the tools used to evaluate statutory

provisions include an examination of the provision in its full context and, as

appropriate, references to legislative history).

    If the statute at issue "can be read more than one way" and is thus properly

deemed ambiguous, *AFL–CIO v. FEC*, 333 F.3d 168, 173 (D.C. Cir. 2003) (citation

omitted), or if the statute is "silent" regarding the relevant question, *Van Hollen, Jr. v.*

*FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016), the Court must proceed to Step Two, wherein

such ambiguity or silence is generally considered to be "'an implicit delegation from

Congress to the agency to fill in the statutory gaps[,]'" *id.* at 495 (quoting *FDA v.*

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (emphasis omitted)).

Accordingly, the nature of judicial review at Step Two is "highly deferential[,]" *Vill. of*

*Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011), meaning

that the court must "accept the agency's [reasonable] construction of the statute, even if

the agency's reading differs from what the court believes is the best statutory

interpretation[,]" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S.

967, 980 (2005) (citation omitted); *see also Peter Pan Bus Lines, Inc. v. Fed. Motor*

*Carrier Safety Admin.*, 471 F.3d 1350, 1353 (D.C. Cir. 2006) (noting that, at *Chevron*

Step Two, the court must defer to the agency's interpretation of a statute if it is "based on a permissible construction of the statute") (internal quotation marks and citation omitted). Significantly for present purposes, although "[a]n agency's interpretation of its enabling statute and its own regulations is usually entitled to deference, . . . there are limits on when and how far a court should defer to the agency[, and a court] must overturn agency action and interpretation inconsistent with the regulations and statutes themselves." *Shepherd v. Merit Sys. Prot. Bd.*, 652 F.2d 1040, 1043 (D.C. Cir. 1981).

### C.    The Endangered Species Act

As explained fully in this Court's prior opinion in this case, "Congress enacted the Endangered Species Act in 1973 with the aim of conserving and protecting endangered and threatened species and the ecosystems on which those species depend." *Otay Mesa Prop.*, 144 F. Supp. 3d at 40 (citing 16 U.S.C. § 1531(b)); *see also Alaska Oil & Gas Ass'n*, 815 F.3d at 550–51 ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers."), *cert. denied sub nom. Alaska Oil & Gas Ass'n v. Zinke*, 137 S. Ct. 2091 (2017), *Alaska v. Zinke*, 137 S. Ct. 2110 (2017). To accomplish this goal, the Act directs the Secretary of the Interior to list "endangered" and "threatened" species for federal protection, 16 U.S.C. §§ 1532(6), (20), and also to designate geographical areas as "critical habitat" for listed species, where appropriate, *id*. § 1533(a)(3)(A)(i). "The Department of the Interior administers the ESA for non-marine species and has delegated to the Fish and Wildlife Service (an agency within the Interior Department) the authority to list such species as 'endangered' or 'threatened' through rulemaking." *Otay Mesa Prop.*, 144 F. Supp. 3d at 40 (citing 50 C.F.R. § 402.01 (2015)). The FWS is also authorized to make the "critical habitat" determination. *See* 50 C.F.R. § 424.10.

When the agency undertakes to list a species under the ESA or make a critical habitat designation, the ESA requires the agency to rely on the best available scientific data. *See* 16 U.S.C. § 1533(b).

As relevant here, the ESA delineates two types of critical habitat for endangered species:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed [as endangered or threatened under the statute], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . , upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). Subdivision (i) is commonly referred to as "occupied" critical habitat, while subdivision (ii) is typically termed "unoccupied" critical habitat. The Act further instructs that, "[e]xcept in those circumstances determined by the Secretary, critical habitat *shall not include the entire geographical area* which can be occupied by the threatened or endangered species." *Id.* § 1532(5)(C) (emphasis added). Properly understood, then, the statutory text of the ESA plainly requires the agency to start by delineating the geographical area that the species at issue occupies, and then proceed to determine the critical habitat by reference to that area, with occupied critical habitat being a *subset* of that area (or in exceptional cases, coextensive with that area) and unoccupied critical habitat consisting of specific geographical areas outside the area occupied by the species. *See id.* § 1532(5)(A).

Importantly, the Secretary of the Interior has promulgated regulations that pertain to how the agency implements the ESA's critical habitat requirements. *See* 50 C.F.R. § 424.12 (titled "Criteria for designating critical habitat"); *see id.* § 424.12(b) (specifying that, "[w]here designation of critical habitat is prudent and determinable, the Secretary will identify specific areas within the geographical area occupied by the species at the time of listing and any specific areas outside the geographical area occupied by the species to be considered for designation as critical habitat"). With respect to determining the occupied critical habitat of an endangered species, the regulations underscore that occupied critical habitat should be a *portion* of the overall area that a species occupies, by instructing the Secretary to:

> (i) Identify the geographical area occupied by the species at the time of listing.
>
> (ii) Identify physical and biological features essential to the conservation of the species at an appropriate level of specificity using the best available scientific data. . . .
>
> (iii) Determine the specific areas *within* the geographical area occupied by the species that contain the physical or biological features essential to the conservation of the species.
>
> (iv) Determine which of these features may require special management considerations or protection.

*Id.* § 424.12(b)(1) (emphasis added). Similarly, for unoccupied critical habitat, the regulations instruct the Secretary to "identify, at a scale determined by the Secretary to be appropriate, specific areas *outside* the geographical area occupied by the species that are essential for its conservation, considering the life history, status, and conservation needs of the species based on the best available scientific data." *Id.* § 424.12(b)(2) (emphasis added). Neither the statute nor the applicable regulations defines "the

geographical area occupied by the species"—*i.e.*, the key reference point in making the critical habitat designation under the statute—and neither explains how the Secretary should go about identifying this geographical area.

## III.    ANALYSIS

It has taken years of litigation and multiple rounds of briefing, but the core legal question underlying the parties' dispute in this matter has now become apparent.  This issue—the appropriateness of the FWS's methodology for drawing the boundaries of the critical habitat for the Riverside fairy shrimp—implicates two relatively straightforward questions of statutory interpretation:  first, whether the FWS's manner of determining "the geographical area occupied by the [Riverside fairy shrimp] species" is consistent with the ESA, and second, whether the FWS acted consistently with the ESA and applicable regulations when it identified the critical habitat of the Riverside fairy shrimp solely vis-à-vis the topography of the pertinent geographical without further analysis of whether and to what extent the area actually functions as watershed.  As explained below, this Court has determined that, even after granting the FWS the deference that it is due under *Chevron*, the agency's identification of the geographical area occupied by the Riverside fairy shrimp was unreasonable and therefore arbitrary and capricious, which means that the resulting occupied critical habitat determination violated the APA.  The Court further concludes that the agency's alternative designation of the 56 acres surrounding the stock pond as unoccupied critical habitat violated the ESA, because the agency made that determination solely in reference to the presence of PCEs and without conducting any further analysis about whether preservation of this area was essential for the conservation of the species.

**A.    By Encircling All Vernal Pools Where The Species Has Been Sighted As Well As All Land In Between, The FWS Improperly Identified The Area Occupied By The Riverside Fairy Shrimp**

Because the ESA defines both "occupied" and "unoccupied" critical habitat in reference to "the geographical area occupied by the species[,]" 16 U.S.C. § 1532(5)(A), the FWS's first step in making any critical habitat designation must be to identify the "geographical area occupied by the species" at the time that the agency initially listed the species, *id.*; *see also* 50 C.F.R. § 424.12(b)(1).  In the 2012 Rule, the FWS purports to delineate the "geographical area occupied by the" Riverside fairy shrimp by identifying the outermost geographical boundaries of the various vernal pools in the state of California where the shrimp have been sighted, as follows:

> [T]hat area bounded by the coastline to the west, east to an area near tribal land of the Pechanga Band of Luiseño Mission Indians of the Pechanga Reservation, California, in western Riverside County, north into the central foothills of Orange County near the former Marine Corps Air Station (MCAS) El Toro, and south to coastal mesa tops along the United States-Mexico Border in San Diego County.

77 Fed. Reg. 72081.  The rule further notes that, in the years since the Riverside fairy shrimp was first listed as endangered in 1993, the species has been documented in additional areas in Ventura, Orange, Riverside, and San Diego counties in California, and that the FWS considers these additional areas to also be within the geographical area that the Riverside fairy shrimp occupied when it was listed.  *See id.*

Nowhere in the briefing of the issues in this case does the FWS discuss, much less justify, its apparent threshold determination that the Riverside fairy shrimp species "occupies" this *entire* geographical area such that it is appropriate to designate large swaths of land within this area as occupied critical habitat under the ESA.  (*See, e.g.,* Defs.' Combined Opp'n to Pls.' Mot. for Summ. J. & Mem. in Supp. of Cross-Mot. for

Summ. J. ("Defs.' MSJ Mem."), ECF No. 14-1, at 22–30 (ignoring the rule's initial finding regarding the geographical area the species occupies and arguing solely that the vernal pool and 56 additional acres of land that constitute Subunit 5c are properly characterized as occupied critical habitat for ESA purposes because that subunit contains both a pool where shrimp have been found and the requisite PCEs).)  And for the reasons explained below, it is clear to this Court that it is manifestly unreasonable for the FWS to have determined that this entire geographic area is "occupied" by the Riverside fairy shrimp.  Thus, even under *Chevron*'s two-step framework, this Court cannot countenance the FWS's decision to interpret the ambiguous statutory term "occupied" to include all of the various vernal pools in the state of California where the Riverside fairy shrimp actually reside *and also all of the land in between those pools*, which means that the 2012 Rule violates the terms of the ESA at the outset, even prior to setting forth the particular critical habitat designation that Otay Mesa challenges in this case.

        1.      <u>Although The Term "Occupied" As It Appears In The ESA Is Ambiguous, The FWS's Determination That The Riverside Fairy Shrimp Occupies Areas Where The Shrimp Are Not (And Can In Fact Never Be) Located Is Unreasonable</u>

It is undisputed that the ESA does not define the term "occupied" or the related and repeated phrase "geographical area occupied by the species[.]"  *See, e.g.*, *Cape Hatteras Access Pres. All.*, 344 F. Supp. 2d at 119.  To be sure, the lack of a definition alone does not render a word or phrase in a statute ambiguous, *see Otsuka Pharm. Co.*, 302 F. Supp. 3d at 394; however, several courts have evaluated the term "occupied" as it is used in the ESA, and as far as this Court can tell, the unanimous conclusion is that this term is ambiguous for *Chevron* purposes.  *See, e.g.*, *N.M. Farm & Livestock Bureau*

*v. U.S. Dep't of the Interior*, No. 15cv00428, 2017 WL 4857444, at *3 (D.N.M. Oct. 25, 2017) (noting that "[t]he term 'occupied' as used in the ESA has been found to be ambiguous and not plainly defined" (citation omitted)); *Cape Hatteras Access Pres. All.*, 344 F. Supp. 2d at 120 (noting that "[t]he Service does not have a regulation that imposes a single definition of 'occupied' for all species; rather, the Service has retained flexibility and defines the term differently depending on a given species's characteristics"); *cf. Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164 (demonstrating the ambiguous nature of the term by substituting "resides" for "occupied" and noting that,"[v]iewed narrowly, an owl resides only in its nest; viewed more broadly, an owl resides in a [Protected Activity Center]; and viewed more broadly still, an owl resides in its territory or home range").

This Court agrees that "occupied" is susceptible to more than one meaning in the context in which that term appears in the ESA; therefore, that term is properly considered ambiguous such that the FWS is entitled to deference in its construction of it in the context of the instant case. *See Chevron*, 467 U.S. at 842–43; *see also Otsuka Pharm Co.*, 302 F. Supp. 3d at 174 (noting that the relevant question for *Chevron* Step One is whether a statutory provision "[is]susceptible of multiple plausible interpretations and [is] thus ambiguous, or whether there is only one possible interpretation of this statutory language" (internal citations omitted)); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 59 (D.D.C. 2013) (noting that "ambiguity in [a] statutory term would require this Court to proceed to evaluate the permissibility of the agency's interpretation under *Chevron's* step two [which] requires the Court to defer to an agency's interpretation of a statute unless that interpretation is impermissible"

(internal citations omitted)), *aff'd en banc*, 760 F.3d 18 (D.C. Cir. 2014).  But the deference that the FWS is owed with respect to its interpretation of "occupied" in regard to the designation of critical habitat for the Riverside fairy shrimp must give way to the plain language of the ESA when the agency's construction of that term is scrutinized for permissibility under *Chevron*'s Step Two.  *See Cognitive Prof'l Servs.*, 254 F. Supp. 3d at 33 (explaining that, under Step Two, the court determines whether the agency's interpretation of an ambiguous term "'is based on a permissible construction of the statute'" (quoting *Chevron*, 467 U.S. at 843)); *see also Mayo Found. for Med. Educ. & Research v. U.S.*, 562 U.S. 44, 53 (2011) (explaining that, where a statute is silent as to a relevant question, *Chevron* requires courts to defer to the agency's construction of that statute "unless it is arbitrary or capricious in substance, or manifestly contrary to the statute").

     To understand why the instant "occupied" determination fails at *Chevron* Step Two, recall that in the instant case the FWS identified the geographical area that is occupied by the Riverside fairy shrimp by locating on a map the various isolated vernal pools where Riverside fairy shrimp have been sighted and encircling not only all of those pools but also all of the land around and between them.  *See* 77 Fed. Reg. 72081 (describing a single area extending east-to-west from the Pacific coast to western Riverside County, CA, and north-to-south from Orange County, CA to the United States-Mexico border).  This methodology—*i.e.*, determining the entire radius of the geographical area where the animal has been spotted—appears to be one that the agency routinely employs as the first step of making a critical habitat designation, and it seems imminently logical to do precisely this when the FWS is considering a critical habitat

designation *for a mobile species* that might use one geographical area for eating, another area for reproducing, and still another area for sleeping. *See, e.g.*, *Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 123 (D.D.C. 2018) (noting that the critical habitat for a migratory whale species extended from Maine to Florida because the whales "migrate annually from their summer feeding grounds off the Northeast Coast of the United States to their winter breeding grounds off the Southeast Coast" (internal quotation marks and citation omitted)).

Indeed, in such cases, the 'occupancy' question that commonly arises is "how frequently a species must use an area" before an agency can properly deem the species to occupy that area for the purpose of determining its critical habitat, which is admittedly a "highly contextual and fact-dependent inquiry." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164. Relevant factors for making this threshold occupancy determination include "how often the area is used, how the species uses the area, the necessity of the area for the species' conservation, [and] species characteristics such as degree of mobility or migration," *id.*, as well as whether "individual members of the protected species are likely to be found there [and] whether or not the area holds a resident breeding population[,]" *N.M. Farm & Livestock Bureau*, 2017 WL 4857444, at *3. And where "the [species] uses [the area] with sufficient regularity that it is likely to be present during any reasonable span of time[,]" courts have generally deferred to the FWS's determination that a species occupies that particular geographic area. *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164; *see also Cape Hatteras Access Pres. All.*, 344 F. Supp. 2d at 120 (finding that the FWS had permissibly construed the statute where its method of determining whether the species occupied a geographical area was to "look

for areas with 'consistent use,' which [the FWS] defined as those areas where 'observations over more than one wintering season' demonstrated [the species'] presence[]").

Generally speaking, the FWS's look-for-consistent-use-by-the-listed-species approach to determining the geographical area of occupancy is a permissible and reasonable construction of the statutory term "occupied" because "to occupy" means "to take up residence in[.]" Merriam-Webster Dictionary,[6] and because the text and structure of the ESA plainly indicate that Congress intended for the agency to locate those areas where the endangered or threatened species physically exists, at least for some period of time, and then determine which areas *within* that location qualify as critical habitat as defined by the statute. *See* 16 U.S.C. § 1532(5)(A)(i) (emphasis added). But the FWS appears to have abandoned this methodology as applied to the instant "not migratory" species. *See* 77 Fed. Reg. 72079; *see also id.* at 72081 (explaining that the Riverside fairy shrimp is "relatively sedentary and possesses limited dispersal capabilities"). That is, rather than acknowledging the undisputed scientific fact that the vernal pools themselves are the only geographical areas where individual Riverside fairy shrimp are "likely to be found[,]" *N.M. Farm & Livestock Bureau*, 2017 WL 4857444 at *3, or that the species "uses with sufficient regularity[,]"*Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164, the FWS has included in its area of occupancy for this species *the land around these pools*, where the species has never been found and could never physically exist. *See* 77 Fed. Reg. 72081. The FWS's reading also defies logic: under its interpretation of "occupied," if two vernal

---

[6] Located at http://unabridged.merriam-webster.com/unabridged/occupy (last visited Sept. 24, 2018).

pools containing Riverside fairy shrimp cysts were sighted on either side of the Mojave desert, the agency could deem all of the desert area between the two ponds as the "geographical area occupied by the species" even though the species has never been, and could never be, present in the desert. There is nothing about the ESA's use of "occupied," or the plain meaning of that term, or, quite frankly, common sense, that permits this result. *See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164 (emphasizing the Riverside fairy shrimp's limited "degree of mobility or migration").

What is more, the FWS's inclusion of geographical areas where no shrimp are located in its occupancy finding for ESA purposes, simply and solely because such areas are adjacent to where shrimp have been found, clearly runs afoul of the D.C. Circuit's decision in *Otay Mesa Property, L.P. v. U.S. Department of Interior*, 646 F.3d 914 (D.C. Cir. 2011). The panel in that case evaluated the designation of 143 acres of Otay Mesa's land as occupied critical habitat for a different species of fairy shrimp (the San Diego fairy shrimp). The Circuit found that, because there had only been a single sighting of four shrimp in one tire rut on the property, four years after the species was listed as endangered, the FWS had improperly designated the land as occupied critical habitat. *Id.* at 916–17. Furthermore, and notably, the panel rejected the FWS's argument that, even if no shrimp had been located on the property itself, the property was nonetheless "occupied" by the shrimp because it was part of a vernal pool complex connected to other locations where shrimp had been observed. *Id.* at 918. In rejecting this argument, the Circuit emphasized that "the potential existence of San Diego fairy shrimp *outside* plaintiffs' property does not itself show that San Diego fairy shrimp occupy plaintiffs' property[.]" *Id.*

So it is here.  Rather than focusing on whether and to what extent the Riverside fairy shrimp species *actually* occupies the particular geographical area that it seeks to designate, the FWS has located the various pools where the shrimp have been seen and, as a threshold matter, has deemed all of the land around and between those pools—even land on which the shrimp cannot possibly reside—as "occupied" territory.  This methodology is patently inconsistent with the statute's requirement that the agency locate the geographic areas where the species is present (*i.e.*, those areas the species occupies), and as a result, the agency's interpretation of the statute to include areas on which the species does not and cannot exist is not entitled to deference.  *See Shepherd*, 652 F.2d at 1043.  Put in the vernacular of APA jurisprudence, the agency has "failed to consider an important aspect of the problem"—*i.e.*, actual occupancy status of the shrimp—or has offered "an explanation for its decision that runs counter to the evidence before the agency" with respect to the threshold area-of-occupancy determination, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43; therefore, its related determination that the vernal pool and the 56 acres of surrounding land constitute occupied critical habitat must be deemed arbitrary and capricious and in violation of the APA, *id.*

        2.        <u>The Vernal Pool On Subunit 5c Is The Only Geographical Area</u>
                        <u>That The Riverside Fairy Shrimp Species Occupies</u>

In the briefs that the agency has submitted in regard to this matter, counsel for Defendants appears to argue (contrary to the text of the published crucial habitat designation) that the geographical area that the Riverside fairy shrimp species occupies for present purposes is the 57-acre subunit upon which the one-acre stock pond (vernal pool) sits.  (*See* Defs.' MSJ Mem. at 17.)  The briefing contains little explanation as to

*how* the FWS determined, based on sightings that were limited to the stock pond, that Riverside fairy shrimp occupy *all* of Subunit 5c, and the 2012 Rule, which indicates that the FWS has found that "[t]his subunit is currently occupied" by the shrimp based on a 2011 survey that "documented the presence of Riverside fairy shrimp cysts" in the pool bed, 77 Fed. Reg. 72092, is of little help. *See id.* (purporting to explain the FWS's determination that "[t]his subunit is essential for the conservation of Riverside fairy shrimp because its occupied pool and surrounding watershed are essential to maintain habitat function, genetic diversity, and species viability"). Importantly, at the motion hearing held in this matter, counsel for FWS explained the agency's *methodology* for concluding that this area was "occupied" critical habitat: it searched for the PCEs that the FWS had identified for this shrimp species on a map of the area, and then circled both the stock pond and all adjacent land areas where all three PCEs exist. (*See* Mot. Hr'g Tr., 41:4–42:24, Mar. 15, 2017.)

If this is, in fact, how the FWS determined that the Riverside fairy shrimp species occupies all 56 acres of land surrounding the stock pond, the agency has improperly ignored the process the ESA designates for making an occupied critical habitat determination. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Specifically, as noted above, the statute contemplates that the agency will first determine "the geographical area occupied by the species" and *then* proceed to identify the "areas *within* the geographical area occupied by the species" on which the PCEs are found. 16 U.S.C. § 1532(5)(A)(i) (emphasis added). This reading is underscored by the governing regulations, which require the FWS to *begin* by "(i) [i]dentify[ing] the geographical area occupied by the species at the time of listing" and also "(ii)

[i]dentify[ing] physical and biological features essential to the conservation of the species at an appropriate level of specificity using the best available scientific data." 50 C.F.R. § 424.12(b)(1). And it is only *after* the FWS has made these individual determinations that the regulations require FWS to "(iii) [d]etermine the specific areas within the geographical area occupied by the species that contain the physical or biological features essential to the conservation of the species." *Id.* This statutorily-prescribed procedure—first, determining what area a species occupies and the relevant PCEs for the species, and thereafter determining whether and to what extent the PCEs exist *"within* the geographical area occupied by the species" *id.* (emphasis added)— means that the occupied critical habitat will never be more expansive than the actual area of occupancy, and indeed, may not even be the entirety of the occupied area. *See* 16 U.S.C. § 1532(5)(C) ("Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species."). Moreover, and notably, the FWS's decision to determine the area that the Riverside fairy shrimp species occupies by identifying the PCEs that exist on or near the place where the species is located and drawing a circle around the entire geographic area where the PCEs exist results in a critical habitat determination that is *more expansive* than the area in which the species is found, and thus conflicts with the statute's plain text. *See id.* Therefore, it is clear to this Court that the manner in which the FWS designated the stock pond and the surrounding 56 acres as occupied critical habitat violates the APA. *See Mayo Found. for Med. Educ. & Research*, 562 U.S. at 54; *Shepherd*, 652 F.2d at 1043.

In response, Defendants are quick to point out that this Court previously found that "the FWS did not act arbitrarily or capriciously when it determined that endangered Riverside fairy shrimp occupy the vernal pool on Subunit 5c and that the pool and the surrounding watershed area are 'critical habitat' for that listed species within the meaning of the ESA," under either the occupied or unoccupied prong. *Otay Mesa Prop.*, 144 F. Supp. 3d at 69. (*See also* Defs.' 2d Suppl. Br. at 5, 8–9 (describing this Court's prior holding).) The Court did make that finding. But it also expressly noted that the record before the Court did not permit it to assess *how* the FWS had gone about delineating the contours of the area beyond the pool that it deemed occupied critical habitat. *See Otay Mesa Prop.*, 144 F. Supp. 3d at 69. In any event, "a district court has inherent authority to reconsider its interlocutory orders as justice requires[,]" *United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 315 F. Supp. 3d 90, 96 (D.D.C. 2018) (internal quotation marks and citation omitted), and this is especially so with respect to findings that the Court initially (and mistakenly) considered immaterial to the legal issue at hand. Indeed, in this case, it only became apparent after the hearing was held and the supplemental briefs were filed that the FWS's methodology had improperly melded two distinct statutory steps—(1) identifying the area that a species occupies and what the PCEs are, and (2) determining where the PCEs are located within the occupied area. (*See* 2d Suppl. Br. Order at 4 (indicating that, "although this Court has previously asserted that the distinction between 'occupied' and 'unoccupied' is 'seemingly immaterial to the APA claim at hand[,]' given the parties' current disagreement about the suitability of the methodology that the agency employed to reach the critical habitat designation at issue here, it is now clear to the Court, that the

28

'occupied' versus 'unoccupied' determination matters" (quoting *Otay Mesa Prop.*, 144 F. Supp. 3d at 61) (alteration in original) (citation omitted)).

Furthermore, this Court's supplemental briefing order put the parties on notice that the Court might need to revisit the issue of whether the acreage surrounding the pond qualifies as "occupied" or "unoccupied" critical habitat. (*See id.* (explaining that the question of whether the critical habitat designation violates the ESA "may turn on a threshold issue that this Court did not reach when it considered the parties' first round of summary judgment briefs: whether and to what extent, per the ESA, the geographic area surrounding the stock pond qualifies 'occupied' or 'unoccupied' terrain").) Thus, this Court rejects Defendants' suggestion that the issue of whether all of Subunit 5c is occupied has already been definitively resolved and is therefore not at issue in the context of this briefing. (*See* Defs.' 2d Suppl. Br. at 8 ("The Court has already upheld FWS' conclusion that [S]ubunit 5c is within the geographical area occupied by the species at the time of listing.")[7]

As explained above, this Court finds that the approach that the FWS has espoused in its brief for designating the pond and the additional 56 acres of land as "occupied" by relying on the PCEs is inconsistent with the ESA. By contrast, under a permissible construction of the statute, the record evidence in this case establishes that the Riverside fairy shrimp occupy the one-acre stock pond on Subunit 5(c) (*see* AR

---

[7] To the extent that any portion of this Court's earlier ruling could be considered law of the case on the issue of whether the Riverside fairy shrimp occupy the entirety of the designated area, this Court finds it proper to exercise its discretion to revisit this issue here in light of the Court's misunderstanding about the agency's arguments regarding its methodology. *See Pepper v. United States*, 562 U.S. 476, 506–07 (2011) (noting that the law of the case doctrine "directs a court's discretion, it does not limit the tribunal's power" and that it "does not apply if the court is convinced that [its prior decision] is clearly erroneous and would work a manifest injustice" (alteration in original) (internal quotation marks and citation omitted)).

003806–11, 004784–817, 037261–76), and that two of the three PCEs that pertain to the Riverside fairy shrimp—*i.e.*, "ephemeral wetland habitat" (PCE 1) and "the topography and soils that support ponding during winter and spring months" (PCE 3) (*id* 055645)— exist throughout the entirety of that pond, such that the one-acre pond itself qualifies as "the specific area[] within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" per the plain text of the section 1532(5)(A)(i) of Title 16 of the United States Code. This means that the stock pond itself can be properly designated as "occupied" critical habitat consistent with the ESA, and it also compels the conclusion that the FWS's extension of the "occupied" critical habitat designation to the entirety of Subunit 5(c)— the additional 56 acres of land surrounding the stock pond where the species do not and cannot exist but where the PCEs are present—was an unauthorized (*i.e.*, arbitrary and capricious) critical habitat determination that violated the APA.

*Alaska Oil and Gas Association v. Jewell*, 815 F.3d 544 (9th Cir. 2016), does not demand a different result. (*See* Defs.' 2d Suppl. Br. at 20–21 (citing to *Alaska Oil* and arguing that, "after determining that the stock pond was occupied, FWS appropriately used the best available science to identify the areas around the pond that contain the PCEs essential for the conservation of Riverside fairy shrimp to delineate the boundaries for that area of 'occupied' critical habitat").) In *Alaska Oil*, the question of occupancy *was not at issue*, because the geographical areas that the agency designated as occupied were indisputably within the polar bear's range. *See Alaska Oil*, 815 F.3d at 558 (noting that the FWS's mapping methodology was "designed to capture a

'robust' estimation of the inland extent of den use"). Instead, the dispute in that case centered on whether the FWS has to establish, relative to the boundaries of the occupied territory, "specifically where, within that area [each of the PCEs] were located." *Id.* at 557. As relevant here, the species at issue in *Alaska Oil* was highly mobile and indisputably moved throughout all of the territory that the agency had designated as occupied. *See id.* at 559. Thus, the Ninth Circuit's suggestion that the occupied critical habitat determination is to be made with reference to the location of the PCEs under the circumstances presented in that case does not answer the question of whether and to what extent the threshold question of occupancy can be made with reference to the PCEs given the static species at issue here.

In short, while this Court recognizes that it can be "difficult to distinguish between occupied and unoccupied areas due to the nature of vernal pools" as a general matter because "[t]he size of a vernal pool . . . fluctuates from year to year, and in some years, the pool itself may never form[,]" *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, S-05-0629, 2006 WL 3190518, at *14 (E.D. Cal Nov. 2, 2006), there is simply no evidence in the instant record that the Riverside fairy shrimp have *ever* occupied any part of Subunit 5(c) other than the one-acre stock pond, which is the only vernal pool on that property. It is true that the statutory term "occupied" is ambiguous, which means that the FWS generally has flexibility and discretion to interpret that term and to apply it to the facts presented when it makes its critical habitat designation, but the agency must exercise that discretion in a manner that is consistent with the plain text of the statute, and the statute plainly requires the agency to identify the geographic area that an endangered species "occupie[s]"—separate and apart from the PCEs—and

then assess where the PCEs exist "within" that geographic area. 16 U.S.C. § 1532(5)(A) (i). Consequently, it is inconsistent with the methodology that the ESA prescribes for the FWS to have defined the area that the Riverside fairy shrimp species occupies (and by extension designate the occupied critical habitat for that species) merely by locating the geographic area around and beyond the stock pond where the PCEs exist (*i.e.*, the entirety of Subunit 5(c)), and as a result, this Court concludes that the agency's occupied critical habitat determination violates the APA. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

**B.    The Unoccupied Critical Habitat Designation Violates The ESA And The APA Because The FWS Did Not Evaluate Whether Any Area Outside The Geographical Area Occupied By The Species Is Essential For Conservation Of The Species**

The ESA plainly "differentiates between 'occupied' and 'unoccupied' areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163. In other words, while the designation of "occupied critical habitat" under the ESA turns on the identification of the areas that the species occupies and where the PCEs exist within those areas, the designation of "unoccupied critical habitat" requires a determination that geographical areas that the species does *not* occupy "are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Of course, this distinction makes imminent sense, because the United States is a massive geographical area filled with natural flora and fauna, and thus environmental laws such as the ESA "must balance the oft-competing statutory policies of environmental protection and private property rights." *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 965 (9th Cir.

2003). To avoid overprotection of creatures to the detriment of landowners, Congress decided to protect geographical areas that an endangered or threatened species actually occupies when those areas contain features essential to conserve the species, *see* 16 U.S.C. § 1532(5)(A)(i), and beyond the geographical areas that such a species occupies, only those areas that are in and of themselves essential to the conservation of the species need to be preserved, *see id.* § 1532(5)(A)(ii). *See* Jaclyn Lopez, *Biodiversity on the Brink: The Role of "Assisted Migration" in Managing Endangered Species Threatened with Rising Seas*, 39 Harv. Envtl. L. Rev. 157, 170 (2015) (noting that "[t]he designation of unoccupied critical habitat does not require that the Service identify physical and biological features essential to the conservation of the species or which may require special management considerations or protection, only that it is essential for the conservation of the species").

When the FWS announced in the 2012 Rule that Subunit 5(c) is occupied critical habitat for the Riverside fairy shrimp and would be designated as unoccupied critical habitat in the alternative, *see* 77 Fed. Reg. 72089, the agency gestured to the required, "essential for the conservation of the species" finding, *id.* at 72079, but did nothing more to substantiate this conclusory finding than observe that the PCEs were present on the land. (*See infra.*)[8] Thus, for the reasons explained below, the agency's unoccupied

---

[8] The FWS appears to have made the alternative "unoccupied critical habitat" finding in response to the D.C. Circuit's decision in *Otay Mesa Property, L.P. v. U.S. Department of the Interior*, 646 F.3d 914 (D.C. Cir. 2011), wherein, as discussed *supra*, the Circuit reversed the FWS's designation of 143 acres of property that Otay Mesa owns as occupied critical habitat for the San Diego fairy shrimp. 646 F.3d at 915. In consideration of the FWS's argument that the property was essential to the conservation of the species even if there was no evidence of occupancy, the Circuit panel acknowledged that the FWS had the discretion to designate the property at issue as unoccupied critical habitat, but noted that if the FWS opted to proceed in this manner, "then it must say so in its agency decision and justify that determination." *Id.* at 918. In light of this ruling, and "due to the lack of documentation of occupancy, such as survey results prior to 1993, for the purposes of this rulemaking [the FWS] determine[d] that

critical habitat designation is arbitrary and capricious, and in violation of the ESA, for APA purposes.

As an initial matter, it is important to recognize that "Congress did not define 'essential' but, rather, delegated to the Secretary the authority to make that determination." *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 464 (5th Cir. 2016) (internal quotation marks and citation omitted), *cert. granted sub nom. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 138 S. Ct. 924, 924 (2018). But as explained above, that alone does not mean that the FWS's bald statement that these are "areas essential for the conservation of the species" in the 2012 Rule has to be accepted. *See Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 980. For an agency's decision to be upheld at the summary judgment stage when challenged under the APA, the agency "must [have] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)); *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 281, 285 (1974) (making clear that the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" (internal quotation marks and citation omitted)).

The "essential for the conservation of the species" finding that the FWS made here falls far short of this standard. In the 2012 Rule, the FWS asserted that the entirety of Subunit 5c qualifies as unoccupied critical habitat because "[t]hese areas are

---

these subunits also alternatively meet the definition of [unoccupied] critical habitat in section 3(5)(A)(ii) of the Act."  77 Fed. Reg. 72082.

essential for the conservation of the species, and a designation limited to areas documented to have been occupied at the time of listing would be inadequate to ensure the conservation of Riverside fairy shrimp." 77 Fed. Reg. 72082. It appears that the agency based this contention solely upon its finding that the relevant PCEs exist on the land surrounding the stock pond, and *not* on an assessment of whether preservation of this particular geographical area was necessary (*i.e.*, "essential") for conservation of the shrimp cysts. *See id.* at 72073 (remarking in regard to the unoccupied designation of Subunit 5c that the land has "[u]nique soils and habitat type; maintains current geographical, elevational, and ecological distribution; [is a] disjunct habitat; [and] protects existing vernal pool composition"). The agency's manifest failure to consider, much less determine, whether protection of all 56 acres was necessary for conservation of the endangered species that is itself located in the one-acre stock pond cannot be squared with the plain language of section 1532(5)(A))(ii) of Title 16 of the United States Code, which requires the agency to do exactly that in order to make an unoccupied critical habitat designation.

Notably, the FWS does not deny that its "unoccupied critical habitat" designation relied on the same methodology the agency had used to determine that Section 5(c) qualifies as occupied critical habitat—the agency "focus[ed] . . . on the PCEs. . . . [and] looked at where those elements were present surrounding stock the pond[,] [a]nd that's how they drew it." (Hr'g Tr. at 47:7–16.) *See also* 77 Fed. Reg. 72082–83 (explaining that the agency removed some areas from the scope of the area designated as "essential to the conservation of Riverside fairy shrimp" in earlier rules because "they no longer contain the physical or biological features or PCEs that are essential to the conservation

of Riverside fairy shrimp"); *id.* at 72092 (discussing the features of Subunit 5c in particular and concluding, on that basis, that this geographical area is "essential for the conservation of Riverside fairy shrimp").  But the language of the relevant statute does not permit reliance on the mere presence of pertinent biological features (PCEs) to determine that an area qualifies as unoccupied critical habitat; instead, Congress has quite clearly decided that the touchstone of unoccupied critical habitat (in contrast to occupied critical habitat) is whether the area *itself* is "essential" to the conservation of the species.  16 U.S.C. § 1532(5)(A)(ii); *see also Cape Hatteras Access Pres. All.*, 344 F. Supp. 2d at 119 (holding that, when designating unoccupied critical habitat, "it is not enough that the area's features be essential to conservation, the area itself must be essential").

Indeed, to make the unoccupied critical habitat designation based simply and solely on a finding that the land at issue "contained necessary primary constituent elements" (as the FWS has done here) "would be to nullify the distinction between occupied and unoccupied land, a distinction Congress expressly included within the ESA."  *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 268 F. Supp. 2d 1197, 1221 (E.D. Cal. 2003), *abrogated in part on other grounds by Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983 (9th Cir. 2010); *see also Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015) (upholding the FWS's designation of unoccupied critical habitat where PCEs were implicated, because the FWS had "*not* designate[d] [the subunit at issue] as essential *only* because it contains PCEs" but had also provided the sources for certain PCEs (emphasis added)).  Thus, this Court discerns a clear conflict between what Congress has prescribed and

what the FWS has done to implement its statutory prescriptions in this case.  *See* 5

U.S.C. § 706(2)(A) (requiring a court to "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . not in accordance with law").

The FWS's only cogent response to this conclusion is to point out that the ESA

directs the agency to utilize the "best scientific data available[,]" and that there are no

existing studies of the extent to which the land around the stock pond on Subunit 5(c)

actually supports the continued existence of the Riverside fairy shrimp species that

occupy the one-acre vernal pool.  (Defs.' 2d Suppl. Br. at 16–17.)  Of course, this

statutory language says nothing about whether, and to what extent, the agency his

required to conduct a study prior to making the challenged critical habitat designation.

At most, the "best scientific data available" language indicates that Congress was aware

of the limits of scientific knowledge and ability, and thus has authorized the agency to

use only the best *available* information when it undertakes to make the necessary

findings for the purpose of making a critical habitat designation.  To read that language

to authorize the agency to *dispense* with making the "essential for conservation of the

species" finding entirely not only renders section 1532(5)(A)(ii) of Title 16 of the

United States Code meaningless, but also clearly undermines Congress's intent with

respect to requiring the agency to make such a finding at all.  And the D.C. Circuit has

already addressed the mistaken contention that an agency has authority to act in the

absence of data regarding the scope of the watershed:  "the absence of a requirement for

the Service to collect more data on its own is not the same as an authorization to act

without data to support its conclusions, even acknowledging the deference due to

agency expertise."  *Otay Mesa Prop.*, 646 F.3d at 918.  This means that the FWS can

take no comfort in the fact that it has not yet utilized its expertise to do the kinds of scientific analysis that are needed to make a proper unoccupied critical habitat designation; given the text of the statute, the fact that studies do not currently exist cannot possibly mean that such analysis need not be done. That is, if the ESA's requirement that the unoccupied critical habitat designation be extended only to those geographical areas that are "essential for conservation of the species" means anything, then the agency that implements the ESA has to do what it takes to make the requisite finding before it designates an area as unoccupied critical habitat pursuant to that statute.

The bottom line is this: there is no dispute that the scope of the area of unoccupied habitat in the instant case was determined based on the existence and location of the PCEs on Subunit 5(c), and *not* on any assessment of the extent of land area that is *actually* essential to support the Riverside fairy shrimp, which is what the ESA requires. Thus, the FWS's conclusion that 56 acres of land around the one-acre stock pond qualifies as unoccupied critical habitat turned solely on where PCEs were co-located, rather than how much land was necessary to support the needs of the Riverside fairy species (*see* Hr'g Tr. at 41:7–16), when the plain language of the statute demands that the FWS undertake to make the latter determination. Such a conflict bears the hallmark of arbitrary and capricious agency action under the APA. *Cf., e.g.*, *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 54 (D.D.C. 2015) (finding that agency had violated the APA in issuing an interpretive rule that was "contrary to the plain language of the statute"). What is more, in the instant case, the FWS also "relied on factors which Congress has not intended it

to consider," and "entirely failed to consider an important aspect of the problem," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43—namely, whether and to what extent the land that comprises Subunit 5(c) is itself "essential" for the preservation of the stock-pond-bound shrimp species.

It may well be that, in the final (proper) analysis, all of the designated acres are determined to be essential for the preservation of this endangered species, *see* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* (Mar. 1998), at xix (noting that unoccupied critical habitat "may be designated for an upstream area maintaining the hydrology of the species' downstream habitat"), and the Court takes no position as to whether a full hydrological analysis would be necessary to determine what area surrounding the stock pond is essential, as Otay Mesa asserts. "This Court of course 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Otay Mesa Prop.*, 646 F.3d at 917 (quoting *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 ). And here, the agency has failed to articulate any rational reason for its finding that Subunit 5(c) is an unoccupied area that is essential to the conservation of the Riverside fairy shrimp species; therefore, the challenged critical habitat designation violates the ESA and APA.

**C.    This Court Will Vacate The FWS's Designation Of Otay Mesa's Property As Critical Habitat For The Riverside Fairy Shrimp**

Finally, having decided that the FWS erred in delineating the critical habitat for the Riverside fairy shrimp, the normal course of action would be for this Court to vacate the FWS's designation and remand the matter to the agency. *See* 5 U.S.C. § 706(2)(A) (directing a reviewing court to "hold unlawful and set aside agency action,

findings, and conclusions [that it finds to be] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)). However, the Court has some discretion on this front; indeed, "[a]n inadequately supported rule . . . need not necessarily be vacated." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see* 5 U.S.C. § 702 (providing that "[n]othing [in the APA's judicial review provisions] affects . . . the power or duty of the court to . . . deny relief on any . . . appropriate legal or equitable ground"). (*See also* Defs.' MSJ Mem. at 54 (noting this Court's discretion and requesting leave to submit "additional briefing regarding the appropriate remedy if it rules in Plaintiffs' favor on any of the issues raised in their claim for relief").

In determining whether to allow the challenged critical habitat designation to stand pending agency action on remand, this Court must assess "'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal*, 988 F.2d at 150–51 (quoting *Int'l Union, United Mineworkers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)). Courts regularly decline to exercise this discretion where an agency has committed substantive errors, as opposed to procedural ones. *See, e.g.*, *Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100, 105 (D.D.C. 2002) (holding the FWS's choice of methodology in that case "constitute[d] serious substantive errors, not mere procedural flaws, and hence warrant[ed] vacatur"); *Nat'l Ass'n of Homebuilders v. Norton*, 00-cv-903, 2001 WL 1876349, at *3 (D. Ariz. Sept. 21, 2001) (vacating rule where the FWS's

"failure to comply with the statutory requirements [for] critical habitat designation is more than a minor procedural error"); *Endangered Species Comm. of the Bldg. Indus. Ass'n of S. Cal. v. Babbitt*, 852 F. Supp. 32, 41–43 (D.D.C. 1994) (declining to vacate critical habitat designation where the agency's error was procedural rather than substantive).

Under the circumstances presented here, the agency's missteps pertaining to the designation of critical habitat weighs in favor of vacatur. As this Court has explained in detail, the designation of Otay Mesa's property as critical habitat suffers from substantive defects stemming from the FWS's failure to delineate the area that the species occupies properly, and that failure renders the occupied critical habitat designation unsustainable. (*See* Part III.A, *supra*.) In addition, the agency acted contrary to the statute and in an arbitrary and capricious fashion when it looked solely to the presence of PCEs to determine what part of the area surrounding the stock pond qualifies as unoccupied critical habitat and essentially ignored the statutory requirement that it actually undertake an assessment of whether and to what extent the surrounding area is "essential" to the conservation of the Riverside fairy shrimp species. (*See* Part III.B, *supra*.)

There is also no evidence that vacatur of the critical habitat designation at issue here will necessarily be disruptive of, or threaten, the species. *Cf. Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 4–5 (D.D.C. 2002). As has been repeatedly explained, the Riverside fairy shrimp is listed as an endangered species and the record demonstrates that that species currently occupies only the one-acre stock pond. The listing alone provides substantial protection for the species, and vacatur of

the erroneous critical habitat rule "will in no way disturb the considerable protections, both civil and criminal, afforded to the [species] as a listed species under the ESA." *Id.*; *see also Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 5 (D.D.C. 2016) (holding that, when determining whether to vacate agency action, a court can consider "[t]he availability of these alternative measures" that will mitigate potential environmental harms that could otherwise result from vacatur), *appeal dismissed*, No. 16-5224, 2016 WL 6915561, (D.C. Cir. Oct. 31, 2016). Indeed, in 2002, during prior proceedings involving this very species and critical habitat determination, the FWS asked that the designation be vacated and the matter remanded to the FWS to allow the agency to redo the economic analysis for the critical habitat, and the agency specifically represented that "vacatur of the critical habitat designations during the remand period will not compromise the conservation needs of the two species" in light of the "host of regulatory protections beyond those found in Section 7" that would protect the species "even absent critical habitat designation." *Bldg. Indus. Legal Def. Found.*, 231 F. Supp. 2d at 106; *see also Otay Mesa Prop.*, 646 F.3d at 918–19 (vacating designation of Otay Mesa's land as critical habitat for the San Diego fairy shrimp).

    Thus, in light of (1) the clear substantive flaws in the methodology that the FWS used to designate 50-plus acres of Otay Mesa's property as a critical habitat for the Riverside fairy shrimp, and (2) "the overlapping regulatory structures that protect the species and their unique vernal pool and riparian habitats," *Bldg. Indus. Legal Def. Found.*, 231 F. Supp. 2d at 107, as well as the absence of any evidence of potential significant disruptive consequences arising from vacatur under the circumstances

presented here, this Court will vacate the designation of Subunit 5(c) as a critical habitat for the Riverside fairy shrimp and remand this matter to the FWS for further proceedings consistent with this Opinion.

## IV.     CONCLUSION

The FWS's designation of Otay Mesa's property as either occupied or unoccupied critical habitat for the Riverside fairy shrimp was arbitrary and capricious and in violation of governing law for the reasons explained above.  Accordingly, as stated in the accompanying order, Otay Mesa's renewed motion for summary judgment will be **GRANTED**, and Defendants' renewed motion for summary judgment will be **DENIED**.  Moreover, the existing rule designating Otay Mesa's property as critical habitat for the Riverside fairy shrimp will be **VACATED**, and this matter will be **REMANDED** to the FWS for further rulemaking consistent with this ruling.


DATE:  September 25, 2018          *Ketanji Brown Jackson*
                                  KETANJI BROWN JACKSON
                                  United States District Judge